IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA

| | | |
|---|---|---|
| Estate of Brianna Lynn Beland, by and through Katherine Odete Hayes, as Personal Representative, | ) ) ) ) | C/A No.: 1:20-3006-SAL-SVH |
| Plaintiff, | ) ) ) | |
| vs. | ) ) | |
| Charleston County Sheriff's Office; Officer Julia Washington; Officer W. Rodriquez; Officer M. Duckworth; Deputy Roseanda Tucker; Deputy Sherry Bailey; Deputy Amber McGrew; Deputy Sarvis; Deputy Brenda Simmons; Sergeant Roderick; Chief Deputy Willis Beatty; Deputy David Hassan; Teresa E. Polite, each individually and/or in their capacities as employees of Charleston County Sheriff's Office; Carolina Center For Occupational Health, LLC; Theodolph Jacobs, M.D.; Pepper Geiger, LPN; Glenda Williams, NP; Anntinette Ancrum, CMA; James Peirano, RN; Fatima Richardon/Fludd, LPN; Angela Rutledge, RN; Richard Henry, RN; Tiffany Lattimore, LPN; Nurse E. Watson; Deborah Newman, RN; Rosemary Jordan, RN; Lynette Morris, RN; Rachael Massullo, LPN; Megan Marsillo, LPN; Yolanda Kendrick, RN; Tara Steele, LPN; and Wendy Austin, LPN, each individually and/or in their capacity as employees of Carolina Center for Occupational Health, LLC, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) | REPORT AND RECOMMENDATION AND ORDER |
| Defendants. | ) ) ) | |

For four days, while incarcerated in a detention center in Charleston, South Carolina, Brianna Lynn Beland ("Beland") experienced severe symptoms from drug withdrawal, resulting in her death at the end of that period, on August 19, 2017. Her estate seeks to recover damages, alleging she was not provided adequate medical care.

Beland's estate, by and through Katherine Odete Hayes as personal representative ("Plaintiff"), filed the original complaint for this case in the Charleston County Court of Common Pleas. Following removal of this case to this court, Plaintiff filed her second amended complaint on December 9, 2020, [ECF No. 22], asserting three causes of action: (1) a claim for violation of Beland's Eighth and Fourteenth Amendment rights, brought pursuant to 42 U.S.C. § 1983, (2) a negligence/gross negligence/recklessness—survival claim, and (3) a wrongful death claim. Plaintiff brings these claims against Deputy David Hassan ("Hassan") and his employer, the Charleston County Sheriff's Office ("CCSO") (collectively, "CCSO Defendants")[1] and the Carolina Center for Occupational Health, LLC ("CCOH") and the following CCOH employees: Theodolph Jacobs ("Jacobs"), M.D.; Pepper Geiger ("Geiger"), LPN; Glenda Williams ("Williams"), NP; Anntinette Ancrum ("Ancrum"), CMA; James

---

[1] In response to the CCSO Defendants' motion for summary judgment, Plaintiff informed the court that she is proceeding solely against Hassan and the CCSO, consenting to the voluntary dismissal of all other named individual deputies and employees of the CCSO. [ECF No. 47 at 1 n.1].

Peirano ("Peirano"), RN; Fatima Richardon/Fludd ("Fludd"), LPN; Angela Rutledge ("Rutledge"), RN; Richard Henry ("Henry"), RN; Tiffany Lattimore ("Lattimore"), LPN; Nurse E. Watson ("Watson"); Deborah Newman ("Newman"), RN; Rosemary Jordan ("Jordan"), RN; Lynette Morris ("Morris"), RN; Rachael Massullo ("Massullo"), LPN; Megan Marsillo ("Marsillo"),[2] LPN; Yolanda Kendrick ("Kendrick"), RN; Tara Steele ("Steele"), LPN; and Wendy Austin ("Austin"), LPN (collectively, "CCOH Defendants") (CCSO and CCOH Defendants, collectively, "Defendants").

This case is before the court on Defendants' motions for summary judgment. [ECF Nos. 41, 42]. Having been fully briefed [ECF Nos. 47, 49, 51, 58], the motions are ripe for disposition. Also before the court are Defendants' motions to strike Plaintiff's expert affidavit [ECF Nos. 48, 59] and Plaintiff's motion for extension of time to file a supplemental expert report [ECF No. 50].

Pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B), and Local Civ. Rule 73.02(B)(2)(d) (D.S.C.), the case has been referred to the undersigned for all pretrial proceedings. Having carefully considered the record, the undersigned grants Defendants' motions to strike, denies Plaintiff's motion for extension of time, and recommends the district judge grant CCSO Defendants' motions for summary judgment and grant in part and deny in

---

[2] Marsillo's name is now Megan Flynn. [*See* ECF No. 53-6].

part CCOH Defendants' motion for summary judgment.[3]

## I.     Factual and Background

The parties agree that Beland struggled with opioid addiction since she was a teenager and attempted to get help for her addiction on February 22, 2017, when she entered a suboxone treatment program under the care of a doctor and therapist. [ECF No. 47-3].

On April 22, 2017, Beland was caught shoplifting $3.84 worth of colored pencils. [ECF No. 47-1 at 1]. She appeared for her court date for the shoplifting charge on May 17, 2017, pled guilty, and set up a payment plan to pay the $1,000 fine. [ECF No. 41-7].

On July 5, 2017, Beland tested positive for heroin and cocaine use. Her doctor, Jeffrey Buncher ("Buncher"), M.D., explained in his office note, "Patient is having a lot of grief following the sudden death of her husband. She relapsed this week." [ECF No. 47-4].[4]

During this time, she missed the June and July payments of $171.67 each related to the shoplifting charge. [ECF No. 41-7 at 5–6]. On July 24, 2017, a week after she missed the July payment, the court issued a rule to

---

[3] CCSO has also asserted cross-claims against CCOH based on a contractual provision for indemnification, but the parties do not address these claims in their currently pending motions. [*See* ECF No. 23]. Based on the recommendation above, these cross-claims remain pending.

[4] The father of Beland's daughter, a fisherman, died suddenly on June 19, 2017, working on a fishing boat. [ECF No. 47-5, ECF No. 47-6 at 2].

show cause for August 4, 2017. *Id.* Beland did not appear. On August 4, 2017, the court issued a bench warrant for failure to pay the fine on the shoplifting charge. [ECF No. 47-7].

The bench warrant provides for a fine of $1,030 or 26 days in jail. [ECF No. 47-7]. The bench warrant further provides that because Beland "did fail to satisfy the terms of this sentence," law enforcement is directed "to make a diligent search for the defendant named above and arrest him/her so that he/she can be brought before me to be dealt with according to law, or pay the above mentioned amount in full." *Id.*

On August 14, 2017, Beland was in Mount Pleasant when she rear-ended another vehicle. [ECF No. 41-10]. The officer arrived on scene, ran her driver's license, and found her driver license suspended and the bench warrant. Beland was arrested on the warrant and issued tickets for driving under suspension and no proof of insurance. *Id.*[5] Beland was transferred to the custody of North Charleston Police Department, which transported her to the Sheriff Al Cannon Detention Center ("detention center"). [ECF No. 47-1

---

[5] CCSO Defendants have submitted additional evidence pertaining to Beland's background, including other traffic tickets she received and concerning her history of drug use. [*See, e.g.*, ECF No. 41-1 at 2–5]. Plaintiff objects to the submission of at least some of this evidence, citing Fed. R. Evid. 609, 404(b), and 608(b). [*See* ECF No. 47 at 2]. Because the court need not consider the evidence in question to resolve the pending motions, this dispute need not be resolved.

at 3].[6]

During Beland's booking on the evening of August 14, 2017, the guards found in her purse a spoon and used hypodermic needle for injecting drugs, an unidentified white pill, and an empty bottle of her prescribed Suboxone. [ECF No. 47-13, ECF No. 47-14, ECF No. 41-12 at 4]. As part of the routine intake and booking process for new arrivals at the detention center, Beland presented to the medical screening nurse Newman. [ECF No. 42-3 at 2–9]. Beland told Newman she injected two bags of heroin daily, had unfilled prescriptions for depression and a urinary tract infection, and a history of depression and anxiety. *Id.* Newman noted track marks on Beland's legs and recorded "Pt injects heroine into her legs." *Id.* at 6. Beland denied using other drugs such as benzodiazepines, cocaine, methamphetamine, and/or narcotics, ever being hospitalized for substance abuse, or attending a detox or outpatient treatment. *Id.* at 3.[7] Beland refused a pregnancy test. *Id.* at 2. When asked if she had any medical conditions that were not being addressed, she said no. *Id.* at 7. She was housed in the general population. *Id.*

The next morning, Tuesday, August 15, 2017, Newman referred Beland

---

[6] During all relevant times, CCSO was responsible for the operations of the detention center, and CCOH contracted with Charleston County to supply medical professionals to screen and treat inmates and detainees at the detention center. [*See* ECF No. 42-1 at 2].

[7] In the months preceding her arrest, Beland had tested positive for cocaine, heroin, fentanyl, morphine, codeine, amphetamines, and benzodiazepines.

for a mental health evaluation; however, there is no record she was ever seen by mental health. [*See* ECF No. 42-3 at 19].[8] Newman also placed Beland on the Clinical Opiate Withdrawal Scale ("COWS") evaluation list to have her periodically assessed for opiate withdrawal and performed the initial COWS evaluation at 6:39 a.m. that morning. *Id.* at 15–18.[9] Beland's initial COWS score was 1, which Newman attributed to her anxiety. *Id.* at 16.[10]

Beland received another COWS evaluation by Peirano at 10:37 a.m.; her total score was zero. *Id.* She verbalized no complaints, and Peirano noted no acute distress. *Id.* Later that evening, Richardson attempted to perform a COWS evaluation, but Beland refused. *Id.*

She had a video recorded visit with Jerry Duke ("Duke"), the father of her friend she had been living with, at 6:37 p.m. [ECF No. 41-16].[11] During

---

[ECF No. 41-1 at 4–5, *see also* ECF No. 41-4].

[8] Williams' name is also on the referral, but she testified that on the days in question, she was on call, and indicated she reviewed, but did not perform, patient assessments. [*See* ECF No. 42-5 at 13:5–16, 21:2–16].

[9] COWS is an 11-item scale designed to be administered by a clinician, and the summed score for the complete scale can be used to help clinicians determine the stage or severity of opiate withdrawal and assess the level of physical dependence on opioids. [*See* ECF No. 42-3 at 15–18, ECF No. 42-4 at 20:5–21:21]. A COWS score of 5–12 is assessed as mild, 13–24 is moderate, 25–36 is moderately severe, and more than 36 is considered severe withdrawal. [ECF No. 42-3 at 18].

[10] On August 15, 2017, at 8:50 a.m., Beland requested to be an inmate worker, but was denied because she had refused a pregnancy test and needed to be cleared by mental health. [ECF No. 41-14].

[11] Beland repeatedly addresses Duke as her father when interacting with him during this and subsequent visits.

the visit, she was talking clearly and begging him to get her out, but she did not complain about any physical problems. *Id.*

On Wednesday morning, August 16, 2017, Beland's cellmate, Cassie Crumpler ("Crumpler"), observed:

> On the second day that Brianna was there, she woke up and told me that she was feeling effects from heroin and Klonopin withdrawal. She told me she had taken heroin just prior to being arrested. I observed Brianna to appear restless, have chills, could not eat anything and was vomiting on and off.

[ECF No. 47-17 ¶¶ 8–9]. At 10:42 a.m., Beland requested medical treatment, stating she was "detoxing from heroin and vomiting exceedingly." [ECF No. 42-3 at 20 (spelling corrected)]. She was seen later that day by Lattimore, who performed a COWS evaluation, scoring a two due to Beland's reported complaints of dry heaving and nausea. *Id.* at 16.

Later that night, during another visit with Duke, she stated:

> I'm not doing good . . . . They won't give me my medicine in here even though I have a prescription for it. They won't give me my medicine. Will not. I've been puking all, all day . . . . I done put in to see the nurse four times. I'm throwing up. I got a fever . . . . I can't do this. Please get me out please . . . . This is torture . . . . Please get me out. Please get me out. I can't do this. I've been throwing up all over myself all day. I can't do this . . . . I'm dying . . . .

[ECF No. 41-17].[12]

---

[12] The record indicates that Beland, on Wednesday evening, also took an unprescribed Klonopin (benzodiazepine) pill of unknown strength given to her by another inmate upon her return to the housing dorm. [ECF Nos. 41-21

A follow up COWS evaluation was performed by an unnamed nurse on August 17, 2017 at 3:46 a.m.; according to this COWS evaluation, Beland reported some stomach cramping within the preceding half hour. [ECF No. 42-3 at 15–17]. No other complaints were noted. *Id.*

At approximately noon, Beland was seen in sick call by Lattimore, and the sick notes are as follows: "Pt. c/o vomiting through out night, not in any distress no s/s of dehydration, states has been able to hold down water, v/s WNL, gait steady." *Id.* at 25. It appears Beland was prescribed Zofran and/or Phenergan for nausea by verbal order from Dr. Jacobs. [ECF No. 42-3 at 25, *see also* ECF No. 42-1 at 6].

Dr. Jeffrey E. Keller ("Keller"), one of Plaintiff's experts, opined as to this medical record as follows:

> On 8/17/2017, at 12:51 PM, a Patient Visit Report by Nurse Practitioner Glenda Williams noted "not in any distress, no s/s of dehydration, states has been able to hold down water." The Plan & Treatment section states "per provider Zofran 4mg TID prn x 3 days." There is no physical exam. The report appears to have been filled out by a nurse. NP Williams may never have actually seen Ms. Beland in person. If she did, she recorded no physical examination and mischaracterized Ms. Beland's vital signs as "WNL" when Ms. Beland, was, in fact, tachycardic. Despite the fact that Zofran was ordered for nausea, Ms. Beland never received a dose of Zofran.

[ECF No. 47-12 at 2].

Almost immediately thereafter, Deputy Bailey called the first Code 37E

and 41-22].

Medical Emergency for Beland at 1:20 p.m., when she found Beland on the ground in the recreation yard. [ECF No. 47-22]. In the main report, Bailey notes as follows:

> Since the inmate was being monitored for dehydration from withdrawals and throwing up for the last few days, I approached the inmate to check on her status. She was not communicating well and unable to sit up. After requesting her to answer and sit up several times, a response was called when she appeared unable.

*Id.* When the response team arrived at the recreation yard, Beland was placed in a wheelchair and transported to medical.

Notes recorded by Henry are as follows:

> 37E called for report of female passed out. Female was noted on rec yard laying down with towel under her head. She stated that she fell and passed out. This was not witnessed. She was assisted to wheel chair and escorted to medical. At medical patient was alert and oriented with c/o nausea and vomiting and was withdrawal from opiate and benzo use, one emesis noted in medical. Received orders from MD to admit to infirmary for 4 hour observation.

[ECF No. 42-3 at 22; *see also id.* at 42 (Jacobs order Beland's admittance for 4 hour observation, diagnosis: "opiate/benzo withdrawal")]. Beland had another COWS evaluation at approximately 1:35 p.m. by Ancrum who recorded a 2 due to complaints of nausea. *Id.* at 16–17. At 2:16 p.m., Jacobs wrote a prescription for Phenergan and ordered Beland to receive Gatorade as needed and an EKG. *Id.* at 27, 42.

Although medical records indicate that Beland may have been provided

10

her first dose of Phenergan at 2:00 p.m., *id.* at 37, Nurse Morris testified

about the treatment Beland received during the 4-hour observation:

> Q:    No medication given?
> A:    Did not give her any medication, no.
> Q:    And no fluids, no , no assistance other than advice?
> A:    Correct.
> Q:    And she was sent back to the unit?
> A:    Correct.

[ECF No. 47-24 at 24:2–7].[13] There is also no indication an EKG was

performed. Beland was given her evening dose of Phenergan, but "declined" a

3:18 a.m. COWS evaluation by Nurse Austin. [ECF No. 42-3 at 16–17, 37].

Around this time, Beland's cellmate Crumpler observed:

> I could see Brianna's muscles locking up and she was unable to
> open her hands from a closed fist. She would cry in pain and
> continue vomiting more and more. Her skin appeared to be gray
> in color. I would describe her appearance as sunken because of
> how her skin was sitting and her eyes and cheeks were sunken in
> and her cheek bones were much more prominent that when she
> first arrived. It appeared she was severely dehydrated.

[ECF No. 47-17 ¶ 17].

Around noon on Friday, August 18, 2017, Beland was given a COWS

evaluation by Geiger, who noted that Beland was reporting bone/joint aches,

---

[13] Inmate Crumpler attested that she observed Beland continuing to have chills, not be able to eat anything, and continuing to vomit, so, on August 17, 2017, she "suggested to Brianna to fake a seizure in order to get the immediate medical attention she needed"; as stated above, Beland was taken to medical, but "[a] few hours later, Brianna returned to the pod and told me they did nothing to help her." [ECF No. 47-17 ¶¶ 14–16, *see also* ECF No. 41-18 at 3].

nausea (but not vomiting) over the last half hour, and anxiety. [ECF No. 42-3 at 16–17]. Geiger also reported "COWS score 5 Pt reports feeling horrible and that she has been vomiting all night. No vomiting noted while nurse in unit. Phenergan given as ordered." *Id.*

At 2:33 p.m., Beland was taken to medical after an officer noticed her hand cramping and that she needed assistance prying her hands off the lunch tray. [ECF No. 41-32, ECF No. 42-3 at 35]. Morris took Beland's vital signs and provided the following assessment and treatment notes:

> PT brought to medical due to a reported witnessed hand spasm. Pt states that her hand and foot sometimes spasm when she is detoxing. She request a muscle relaxer. Pt advd that she is receiving Phenergan, no witnessed spasm during observation. Pt sent back to unit. Advised to drink more water and see the nurse for her monitoring to report if it occurs again.

[ECF No. 42-3 at 34–35].

That evening, Deputy Simmons, who was on duty, monitored Beland's condition and observed her needing help getting to the video visitation booth. [ECF No. 41-35, ECF No. 47-19]. Two people visited Beland that evening. At 6:37 p.m., Duke visited Beland and after about five minutes, Beland stated "Well, okay, Daddy, I need to go lay down. I'm not feeling so good. But I love you. Thanks for coming to see me." [ECF No. 42-20]. During her second visit that evening, beginning at 7:13 p.m., her friend twice asked her to hold her head up. After about six minutes, Beland said, "I need to go lay down, my

hands are hurtin . . . . I love your face." [ECF No. 41-26].

At 7:40 p.m., another inmate yelled to Deputy Simmons that Beland needed help. [ECF No. 47-25]. Deputy Simmons found Beland in her bunk with her hands in a locked position and eyes rolling around. *Id.* Deputy Simmons called the second Code 37E Medical Emergency for Beland. *Id.* Inmate Crumpler described what happened when the response team arrived with a wheelchair:

> . . . multiple nurses arrived with a wheelchair. One of the nurses established dialogue with her and told Brianna to get out of bed and get into the wheelchair. Brianna told the nurse she was unable to get up on her own and needed help. The nurse then said to Brianna, 'So you're refusing medical treatment?' At that point [inmate] Palmer went over to Brianna and assisted her getting into the wheelchair.

[ECF No. 47-17 ¶¶ 18–19]. During transport to medical, based on the video taken in the elevator, it appears that Nurse Flynn mocked Beland's cramped hands. [ECF No. 42-26]. The patient contact notes, written by Jordan, states Beland was

> Found laying in the bed. PT states she can't move and hands are contracted. VS BP 113/80 Pulse 113, RR 18, BS 147 97% on RA. PT c/o nausea and pain in the joints. Small amount of brownish emesis on towel. Hemocult +.

[ECF No. 42-3 at 39]. Jordan reported to the on-call nurse practitioner, Williams, as to Beland's condition. [*See* ECF No. 47-30 at 41:16–43:25]. In response, Williams issued the following, as she explained in her deposition:

> The diagnosis is to admit to infirmary, withdrawal from heroin. Condition is stable. Activity is ad-lib, meaning that there's no restrictions, she doesn't need a wheelchair, doesn't need a walker, doesn't need a cane, doesn't need assistance, she can walk on her own . . . .

[ECF No. 47-30 at 43:4–9; *but see* ECF No. 47-31 (photograph of Beland being taken to medical in a wheelchair)]. The record does not indicate that Jordan reported Beland had spit up blood.

Williams' admissions orders also included orders to take Beland's vital signs every four hours for 24 hours, regular diet and encourage fluids, provide red bag for emesis, COWS evaluations every shift, and additional prescriptions for Bentyl (gut antispasmodic), Flexeril (muscle relaxant), Vistaril (anti-anxiety), and Loperamide (anti-diarrhea). [ECF No. 42-3 at 47]. At 7:45 p.m., Jordan performed a "Nursing Admission Assessment" after receiving the above orders. *Id.* at 50. Beland received her nightly dose of Phenergan at some point and doses of the newly-prescribed medications around 9:19 p.m. *Id.* at 37.

Beland was initially placed in a room with another inmate, Amy Hinson ("Hinson"), directly across from the nurse's station. Hinson provided the following voluntary statement:

> On 8/18/17 I was sleeping when a female was brought into my room and placed on the first bed. She was moaning and complaining. The male officers treated her well and explained they could not touch her and the nurse would return soon.

I watched her for a few minutes as she worked herself off the bed and called the "call" button once, asked me to call once. Both times they arrived quickly. She worked herself into the floor, not a fall, claimed she could not breath as her chest was on the bed before getting to the floor. She seemed to be spitting up. (15 minutes lapsed).

I went to the TV room for about 45 minutes, returned and was told she had been moved. The towels on the floor by the bed had a bloody substance on them from the spitting up.

Everyone seemed to be very professional.

[ECF No. 41-28].

Deputy Hassan testified that he would sometimes be assigned to medical "if the primary person was out," where he was responsible for making his rounds on time, making sure no one was fighting, and, if anyone needed help, notifying the nurses. [ECF No. 47-32 at 9:18–10:3]. On the night in question, Hassan was assigned to medical. In response to Beland seeking assistance mentioned by Hinson above, Nurse Rutledge and Deputy Hassan responded, and Beland complained she was hot, her arms were hurting, and she was cramping. *Id.* at 21:10–19, 23:8–17. During the time Beland was in the observation room, the record indicates she continued to spit up blood. [ECF No. 41-28, ECF No. 47-33 (photographs of bloody towels)].

In her deposition, Rutledge testified as follows:

Q:    When you received your medical training, were you taught what to do if a person is spitting up blood and you don't know why?
A:    Yeah, yes.

Q:    And what would that be?
A:    To inform the provider, get orders, and try and rehydrate and possibly send them out if needed.
Q:    You say "send them out." Send them to the hospital?
A:    Yes.
Q:    The hospital would have the ability to find out why they might be bleeding internally?
A:    Yes.
Q:    Did CCOH have the facilities or ability on-site at the jail to take radiographic studies?
A:    No.
Q:    Or even scope, let's say—run a scope down the esophagus?
A:    No.

[ECF No. 47-29 at 11:18–12:12].

At some point, Beland was transported in a wheelchair to her own room. [ECF No. 41-29, ECF No. 47-35]. Hassan testified Beland was moved to a room where the mattress was on the floor so she would not fall and hurt herself. [ECF No. 49-1 at 35:3–10]. At some point, Beland pressed the white intercom button next to her bunk to ask for help. According to the notes, recorded by Hassan, the following occurred:

> 2200 moved to ML 166
> 2210 She pushed white button Nurse Rutledge check on her
> 2230 Moved to toilet and pushed red call button she had thrown up reddish brown liquid notified Nurse Jordan in front of medical I walked to I/m room and then made another round When nurse came back to check on her I went with her She was sitting on the toilet. Nurse Rutledge had me help lower her to the floor. The Nurse Rutledge had me call 37E on the radio. She started doing CPR on her.

[ECF No. 41-29 (punctuation altered)].

Hassan explained there are two call buttons, one white next to the bed

and one red next to the toilet. As stated, Rutledge responded when Beland pressed the white button. Later, when Beland moved to the bathroom and pressed the red button, Hassan looked through the window,[14] asked Beland if she had vomited, and "[s]he was pointing at the floor and shook her head yes." [ECF No. 51-31 at 29:2–3]. Hassan further testified as follows:

> Q:   Okay. And then, it says, "I walked to inmate room and then made another round." . . . . Did you—you say she had thrown up. Did you go in and, and check on her or anything?
> A:   No, ma'am. I'm not Medical . . . . I reported it to the nurse.
> Q:   Okay. Okay. So, when it says, "I walked to inmate room." Is that Brianna's room?
> A:   Yes, ma'am.
> Q:   And then made another round?
> A:   Yes, ma'am. That means I continued walking after looking through the window. Saw the, you know, whether the blood was going to—the reddish substance on the floor and I continued the round, checking all my checkpoints, told the nurse when I got to the desk and put my information in the computer, and then every 15 minutes, I was doing my rounds.

*Id.* at 18:3–23. Finally, Hassan testified as follows:

> Q:   Okay. "Deputy Hassan notified Nurse Jordan of Inmate Beland vomiting. Approximately ten to 15 minutes later, Deputy Hassan and Nurse Rutledge checked on Inmate Beland again and found her fully clothed sitting on the toiled unresponsive." And, and do you know why it was that Nurse Rutledge didn't get there until ten to 15 minutes later?
> A:   She was dealing with the other patients in the medical unit.

*Id.* at 29:4–13.

---

[14] Hassan testified the window reveals everything in the cell/room, and the rooms were kept with the doors shut and locked unless nurses were passing

The hallway video shows Deputy Hassan and Nurse Rutledge walking in Beland's room at 10:51 p.m. [ECF No. 42-34].[15] Rutledge's notes are as follows:

> Went to check on pt. Pt found sitting on toilet, leaning to her left side, against the wall, fully clothed and unresponsive. Pt had brownish emesis on the floor, in front of the toilet. The officer [Hassan] helped me get the pt off the toilet and on the floor. I used ammonia and sternal rub to try and get a response from pt while checking for a pulse and respirations. Chest compressions were started. The officer was instructed to call a 37-E while I continued chest compressions. During chest compressions, pt had brownish, coffee ground consistency fluid coming from her mouth. Nursing staff [Massullo, Jordan, Marsillo, and Newman] arrived on the scene, shortly after the 37-E was called bringing supplies. I rotated from chest compressions to providing breaths and using suction. AED [defibrillator] was applied to pt chest at some point and one shock was given. CPR was restarted. EMS arrived on scene and CPR was continued until EMS took over and transported the pt to the hospital.

[ECF No. 42-6, *see also* ECF Nos. 42-7, 42-8, 42-9, 42-10].

As to the beginning of the CPR chest compressions, Nurse Rutledge testified as follows:

Q:    When you checked in her mouth, did you see any bloody

---

out medication. [ECF No. 49-1 at 30:17–20, 35:17–25].

[15] Plaintiff argues the hallway video also shows what occurred prior to 10:51 p.m. [*See, e.g.*, ECF No. 51 at 10 ("The hallway security video shows Deputy Hasan and Nurse Rutledge opening the door to Beland's room and entering for a brief time at 9:21 p.m."); *id.* at 11 ("Hassan opened the door to Beland's room at 10:18 p.m."); *id.* ("The hallway video shows Deputy Hassan and Nurse Rutledge looking in the window to Beland's room at 10:41 but they don't open the door or go in. They walk away and come back at 10:51 p.m.")]. However, the hallway video provided to the court by Plaintiff only records what occurred from 10:51 p.m. to 11:30 p.m. [*See* ECF No. 42-34].

vomit?

A:    Not at first. It wasn't until we started doing chest compressions.

Q:    Did you see the bloody vomit on the floor next to the toilet?

A    Yes, I did.

Q:    When you started to see vomit, it was actually—there was a lot of it, a lot of bloody vomit coming out of her mouth, wasn't it?

A:    While doing chest compressions, yes.

Q:    And it was covering her face and her hair?

A:    Yes.

Q:    Getting all over the floor?

A:    Yes . . . .

Q:    Do you have equipment to suction airways at CCOH?

A:    Yes.

Q:    Did you try to use it on Brianna Beland?

A:    Yes . . . .

Q:    Were you successful in aspirating any bloody vomit from Ms. Beland's airway?

A:    We did get some out while suctioning.

[ECF No. 47-29 at 31:18–32:19; *see also* ECF Nos. 47-36, 47-37 (photographs of room and Beland)].

Emergency Medical Services ("EMS") arrived at 11:05 p.m. [ECF No. 47-38 at 1]. The EMS report states the medical staff reported to them Beland had last been seen "normal" forty-five minutes to an hour before then and she had been "in the medical area for the last 4–5 days for detox." *Id.* at 2. EMS suctioned an additional 600 ml of "coffee ground emesis" from Beland's mouth and airway. *Id.* at 1. The autopsy would later find an additional 100 ml of blood in Beland's stomach. [ECF No. 47-39 at 4].

EMS transported Beland to the Medical University of South Carolina

where she was pronounced deceased at 12:04 am on August 19, 2017. [ECF
No. 47-10, ECF No. 47-39 at 1]. A post-mortem toxicology indicates that
Beland tested positive or presumptively positive for opiates, cocaine,
amphetamines, morphine, fentanyl, naloxone (Narcan), and promethazine
(Phenergan). [ECF No. 47-39 at 4, ECF No. 41-30]. The forensic pathologist
concluded:

> In light of the historical information, the toxicological results,
> and the gross and microscopic autopsy findings, it is the opinion
> of the pathologist that the decedent died as the result of
> complications of withdrawal from chronic opiate
> dependence/addiction. Furthermore, the manner of death is best
> deemed natural.

[ECF No. 47-39 at 4].

II.    Discussion

       A.    Standard on Summary Judgment

The court shall grant summary judgment "if the movant shows that
there is no genuine dispute as to any material fact and the movant is entitled
to a judgment as a matter of law." Fed. R. Civ. P. 56(a). The movant bears the
initial burden of demonstrating that summary judgment is appropriate; if the
movant carries its burden, then the burden shifts to the non-movant to set
forth specific facts showing that there is a genuine issue for trial. *See Celotex
Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986). If a movant asserts that a fact
cannot be disputed, it must support that assertion either by "citing to

particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials;" or "showing . . . that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1).

In considering a motion for summary judgment, the evidence of the non-moving party is to be believed and all justifiable inferences must be drawn in favor of the non-moving party. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255 (1986). However, "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Id.* at 248.

B.    Analysis

1.    Motions to Strike and Motion for Extension

As a preliminary matter, the court first addresses (1) Defendants' motions to strike an affidavit submitted by Plaintiff from Gayle Galan ("Galan"), M.D., one of Plaintiff's experts [ECF Nos. 48, 59]. and (2) Plaintiff's motion for extension of time to file Galan's supplemental expert report. [ECF No. 50].

Plaintiff's deadline to name experts was January 8, 2021. [ECF No. 28].

Plaintiff identified four medical experts, including Galan. Their reports, including Galan's [ECF No. 47-28], were served with the expert disclosures in January 2021.

Defendants did not depose Galan. CCSO Defendants did not depose Galan because she only opined in her report as to the CCOH Defendants and did not list any specific officers as having deviated from the standard of care and/or having contributed to Beland's death. [*See* ECF No. 48 at 2]. For example, at no point does this report mention Hassan. [*See* ECF No. 47-28]. CCOH Defendants did not depose Galan because Plaintiff offered to schedule her deposition six days after the Defendants' expert disclosure deadline, notwithstanding the deadline in the scheduling order, and because Galan required pre-payment of $3,500. [*See* ECF No. 62 at 2]. Both CCSO and CCOH Defendants note that Galan's original opinion makes no mention that Beland choked or that choking on her vomit contributed to her death and, instead, addresses acute kidney injury with dehydration. [*See* ECF No. 48 at 2, ECF No. 59 at 2, ECF No. 47-28 at 4]. CCOH Defendants further note that in her original report, Galan does not criticize the lifesaving efforts of the CCOH nurses attempting to resuscitate her. [ECF No. 59 at 2].

Plaintiff deposed Hassan on January 20, 2021. [*See* ECF No. 53 at 3]. Plaintiff deposed Rutledge and Flynn on February 16, 2021. *Id.* at 5. Defendants' expert deadline was March 25, 2021. Discovery closed June 23,

2021, and Defendants filed their motions for summary judgment July 15 and 24, 2021. Plaintiff was granted an extension until August 12, 2021, to file her response.

On August 11, 2021, Galan swore to the affidavit at issue, which "further explain[s her] opinions set forth in [her] report," concluding that "Beland died from choking on the coffee ground emesis in her throat" and identifying Hassan "as a first responder" that possibly could have prevented Beland's death. [ECF No. 47-40 ¶¶ 4, 6]. Hasan further opines in this affidavit that the CCOH nurses who entered her cell at 10:51 p.m., the night Beland died, breached the standard of care by failing to properly aspirate her. *Id.* ¶¶ 7–8.[16]

According to CCSO Defendants, although Galan's affidavit was filed with Plaintiff's motion for summary judgment, it "was never produced to defendants as a 'supplemental opinion,' nor was it produced as a supplement to discovery or as a statement from a witness." [ECF No. 52 at 2].[17]

Leave to amend should be freely granted under Fed. R. Civ. P. 15(a),

---

[16] Defendants repeatedly argue that not only are these "new" opinions inconsistent with Galan's original report, none of Plaintiff's other experts mention choking. [*See, e.g.*, ECF No. 48 at 3].

[17] Although Plaintiff provided Galan's supplemental report on Friday, August 20, 2021, to CCSO Defendants, these defendants argue there are indications that the report may have been created after the affidavit was written and/or filed and after Defendants filed their motions to strike the affidavit. [*See, e.g.*, 52 at 4, ECF No. 52-1].

and amendments are generally accepted absent futility, undue prejudice, or

bad faith. *See Foman v. Davis*, 371 U.S. 178, 182 (1962); *Matrix Capital*

*Mgmt. Fund, LP v. BearingPoint, Inc.*, 576 F.3d 172, 193 (4th Cir. 2009).

When a party wishes to amend after the deadline set in the scheduling order,

the party must, under Fed. R. Civ. P. 16, show good cause to modify the

scheduling order deadlines before also satisfying the Rule 15(a) standard for

amendment. *Nourison Rug Corp. v. Parvizian*, 535 F.3d 295, 298 (4th Cir.

2008). "Rule 16(b)'s good cause standard focuses on the reason for [the

amendment's] tardy submission; the primary consideration is the diligence of

the moving party." *Montgomery v. Anne Arundel County, MD*, 182 Fed App'x

156, 162 (4th Cir. 2006) (citation omitted).

Additionally, pursuant to Fed. R. Civ. P. 26(a)(2)(E), parties are under

a duty to supplement the expert disclosures when necessary under Rule

26(e). Fed. R. Civ. P. 26(e), states that a party

> must supplement or correct a disclosure, (A) in a timely manner
> if the party learns that in some material respect the disclosure or
> response is incomplete or incorrect and if the additional or
> corrective information has not otherwise been made known to the
> other parties during the discovery process or in writing . . . .
>
> For an expert whose report must be disclosed under Rule
> 26(a)(2)(B), the party's duty to supplement extends both to
> information included in the report and to information given
> during the expert's deposition . . . .

In other words, a party has a "duty to supplement," which extends to the

information in the original expert report. Supplementation does not mean that a party may submit a wholly new expert report. As stated by the Fourth Circuit, "Rule 26(e) envisions supplementation 'to add additional or corrective information,'" and "[t]o construe [Rule 26(e)] supplementation to apply whenever a party wants to bolster or submit additional expert opinions would [wreak] havoc in docket control and amount to unlimited expert opinion preparation." *Campbell v. United States*, 470 F. App'x 153, 157 (4th Cir. 2012) (citations omitted)). Such supplementation must be made "by the time the party's pretrial disclosures under Rule 26(a)(3) are due," which is "[u]nless the court orders otherwise . . . at least 30 days before trial." Fed. R. Civ. P. 26(a)(3)(B). As stated, the court ordered the close of discovery on June 23, 2021.

Fed. R. Civ. P. 37(c)(1), provides, in part, that "[i]f a party fails to provide information or identify a witness as required by Rule 26 (a) or (e), the party is not allowed to use that information or witness to supply evidence on a motion, at a hearing, or at a trial, unless the failure was substantially justified or is harmless." *See also Campbell*, 470 F. App'x at 156 ("as we have previously held, and as the language of Rule 37(c)(1) evidences, the Federal Rules impose an 'automatic sanction' of exclusion of a party's expert witness [or relevant information] for failure to adhere to the expert witness requirements set forth in Rule 26(a)") (citations omitted)).

Plaintiff argues the opinions found in Galan's affidavit and proposed supplemental report [ECF No. 50-1] are not inconsistent with her original report and are based on an updated understanding of the facts as discovered when Plaintiff deposed Hassan, Rutledge, and Flynn in January and February 2021. [*See* ECF No. 53 at 3]. Plaintiff notes that she has moved to amend the scheduling order and argues "there is no prejudice whatsoever to the Defendants" where Plaintiff will make Galan available for deposition. *Id.* at 7. In Plaintiff's motion for extension of time, she argues good cause exists "to allow Dr. Galan to supplement" her original report, because the aforementioned depositions "provided new information that Dr. Galan lacked when she prepared her original report." [ECF No. 50 at 2].

Even assuming as true, that Galan's affidavit and supplemental report are based on information not previously provided before certain depositions were taken, Plaintiff has failed to offer any argument or evidence as to diligence or that the delay in offering these documents was substantially justified. Plaintiff does not provide any explanation of why it took 7 months after Hassan's deposition or why it took 6 months after Rutledge and Flynn's depositions for Galan to provide this affidavit. *See S. States Rack And Fixture, Inc. v. Sherwin-Williams Co.*, 318 F.3d 592, 595–96 (4th Cir. 2003) ("Rule 26(e)(1) requires a party to supplement its experts' reports and deposition testimony when the party learns of new information. If the party

fails to do so, the court may exclude any new opinion offered by the expert."); *see also id.* at 597 (holding the following factors should be considered: "(1) the surprise to the party against whom the evidence would be offered; (2) the ability of the party to cure the surprise; (3) the extent to which allowing the evidence would disrupt the trial; (4) the importance of the evidence; and (5) the nondisclosing party's explanation for its failure to disclose the evidence.").[18]

Additionally, that Plaintiff is willing to make Galan available now for a deposition does not mitigate the prejudice to Defendants that re-opening discovery, post-briefing on their motions for summary judgment, would cause. [*See also, e.g.*, ECF No. 62 at 4 ("these Defendants are absolutely prejudiced insomuch as Dr. Galan's untimely opinions are being used specifically to combat the arguments set forth in their pending motion for summary judgment")]. In other words, acceptance of these documents at this time would not be harmless.

Nor is the court persuaded that Galan's opinions as found in her affidavit and supplemental report are merely a "supplement" to her original report, where she identifies a different cause of Beland's death and different people responsible for that death. *See, e.g., Disney Enterprises, Inc. v.*

---

[18] Although the *Southern States* factors are a useful guide, the court need not "tick through" them in deciding a Rule 37(c) motion. *Wilkins v. Montgomery*,

*Kappos*, 923 F. Supp. 2d 788, 795 (E.D. Va. 2013) ("Accordingly, '[c]ourts distinguish true supplementation (e.g., correcting inadvertent errors or omissions) from gamesmanship, and have therefore repeatedly rejected attempts to avert summary judgment by supplementing an expert report with a new and improved expert report.'") (citing *Gallagher v. S. Source Packaging, LLC*, 568 F.Supp.2d 624, 631 (E.D.N.C. 2008)).

> For example, Plaintiff argues that Galan's
>
> opinions that Ms. Beland died as a result of choking is based on Nurse Rutledge's deposition claim that, when she realized CPR was not working, she used suction device to clear Ms. Beland's airway; that she purportedly removed 'some' emesis out of her airway; and that, when EMS arrived shortly thereafter, EMS removed more than half a quart.

[ECF No. 53 at 6 (emphasis removed)]. However, prior to Plaintiff taking Rutledge's deposition, the record indicated, via Rutledge's notes and the EMAS report, that "coffee ground consistency fluid" was coming from Beland's mouth, that Rutledge used suction [ECF No. 42-6], and that EMS suctioned "out of the oral cavity . . . coffee ground emesis" in the amount of 600 ml. [ECF No. 47-38 at 1; *see also* ECF No. 47-28 at 1 (Galan stating in her original report that she reviewed CCOH Medical Records and EMS Records)]. Determining a new cause of death based on similar information provided prior to the deposition in question does not appear to be

---

751 F.3d 214, 222 (4th Cir. 2014).

"supplementation" based information not available prior to the relevant deadlines.

For these reasons, the undersigned grants Defendants' motions to strike Galan's affidavit, found at ECF Nos. 47-40 and 51-42, and denies Plaintiff's motion for extension of time.[19]

### 2.    CCSO's Motion for Summary Judgment

#### a.    Eleventh Amendment Immunity

Plaintiff's first cause of action is brought pursuant to 42 U.S.C. § 1983. A civil action brought pursuant to 42 U.S.C. § 1983 provides a means to vindicate violations of rights, privileges, or immunities secured by the Constitution and laws of the United States, but the statute is not, itself, a source of substantive rights. *Albright v. Oliver*, 510 U.S. 266, 271 (1994). "Section 1983 imposes liability on any person who, under the color of state law, deprives another person 'of any rights, privileges, or immunities secured by the Constitution and laws.'" *Doe v. Kidd*, 501 F.3d 348, 355 (4th Cir. 2007) (citing 42 U.S.C. § 1983). "Under 42 U.S.C. § 1983, a plaintiff must establish

---

[19] The parties also argue as to whether the "sham affidavit" doctrine applies, with Defendants arguing that "if an affidavit is inconsistent with the affiant's prior position, courts may disregard the affidavit pursuant to the sham-affidavit rule" [*see* ECF Nos. 48, 59], and Plaintiff arguing that this rule does not apply because Galan was never deposed. [*See, e.g.*, ECF No. 53 at 2]. Based on the conclusion above, the court need not resolve this issue. Additionally, the undersigned does not address the parties' arguments concerning Galan's affidavit as found elsewhere in briefing, having granted

three elements to state a cause of action: (1) the deprivation of a right secured by the Constitution or a federal statute; (2) by a person; (3) acting under color of state law." *Jenkins v. Medford*, 119 F.3d 1156, 1159–60 (4th Cir. 1997).

The Eleventh Amendment provides, "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. Const. Amend. XI. The United States Supreme Court has long held the Eleventh Amendment also precludes suits against a state by one of its own citizens. *See Edelman v. Jordan*, 415 U.S. 651, 662–63 (1974). This immunity extends not only to suits against a state per se, but also to suits against agents and instrumentalities of the state. *Cash v. Granville Cnty. Bd. of Ed.*, 242 F.3d 219, 222 (4th Cir. 2001).

A plaintiff "is not entitled to monetary damages under § 1983 against Defendants in their official capacities." *Moneyhan v. Keller*, 563 F. App'x 256, 258 (4th Cir. 2014) (citing *Cromer v. Brown*, 88 F.3d 1315, 1332 (4th Cir. 1996) (holding that Eleventh Amendment bars suits against non-consenting state, its agencies, and its officers acting in their official capacities)). However, suits for damages against state officials sued in their individual

_____

Defendants' motions to strike.

capacity are not barred by the Eleventh Amendment. *See Hafer v. Melo*, 502 U.S. 21, 30–31 (1991) ("[T]he Eleventh Amendment does not erect a barrier against suits to impose 'individual and personal liability' on state officials under § 1983.") (citation omitted).

To the extent that Plaintiff has brought suit against Hassan in his official capacity, he is not subject to suit under § 1983, and the undersigned recommends the district judge grant CCSO Defendants' motion for summary judgment regarding claims brought against Hassan in his official capacity.

b.    Deliberate Indifference to a Serious Medical Need

Actions brought pursuant to 42 U.S.C. § 1983 by pretrial detainees are evaluated under the Fourteenth Amendment. *Bell v. Wolfish*, 441 U.S. 520, 535, 537 n. 16 (1979); *Martin v. Gentile*, 849 F.2d 863, 870 (4th Cir. 1988). Plaintiff's rights under the Fourteenth Amendment are at least as great as Eighth Amendment protections available to prisoners. *Martin*, 849 F.2d at 870.[20]

A prisoner has a constitutional right to the medical care necessary to address his serious medical needs. *See Estelle v. Gamble*, 429 U.S. 97, 103–

---

[20] CCSO Defendants, but not CCHO Defendants, argue Plaintiff was not a pretrial detainee but incarcerated and therefore subject to an Eighth Amendment, versus Fourteenth Amendment, analysis. [*See* ECF No. 47 at 13, ECF No. 49 at 1, *see also* ECF No. 47-7 (bench warrant directing Beland to be brought before the court)]. To the extent that Beland is not a pretrial detainee, the above analysis still applies. *See Martin*, 849 F.2d at 870.

31

04 (1976). And a prison official's "deliberate indifference to an inmate's serious medical needs constitutes cruel and unusual punishment under the Eighth Amendment." *See Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014). A claim of deliberate medical indifference requires more than a showing of mere negligence, *Estelle*, 429 U.S. at 105–06, and "more than ordinary lack of due care for the prisoner's interests or safety." *Whitley v. Albers*, 475 U.S. 312, 319 (1986). Treatment "must be so grossly incompetent, inadequate or excessive as to shock the conscience or to be intolerable to fundamental fairness." *Miltier v. Beorn*, 896 F.2d 848, 851 (4th Cir. 1990) (citation omitted).

More specifically, Plaintiff must first show, objectively, that she had a serious medical condition. "A medical condition is shown as objectively serious when it 'would result in further significant injury or unnecessary and wanton infliction of pain if not treated.'" *Formica v. Aylor*, 739 F. App'x 745, 755 (4th Cir. 2018) (citing *Gayton v. McCoy*, 593 F.3d 610, 620 (7th Cir. 2010)). Plaintiff must then show a prison official's subjective indifference to that need. To satisfy the subjective inquiry of a deliberate indifference claim, the plaintiff must show that the public official "knows of and disregards an excessive risk to inmate safety or health." *See Farmer v. Brennan*, 511 U.S.

825, 837 (1994).[21]

Defendants also assert a qualified immunity defense. Under this defense, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Qualified immunity ensures that "[o]fficials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines." *Maciariello v. Sumner*, 973 F.2d 295, 298 (4th Cir. 1992). Whether an officer is entitled to qualified immunity is a question of law for the court and, when there are no relevant disputed material facts, a court should rule on the qualified immunity issue at the summary judgment stage. *Willingham v. Crooke*, 412 F.3d 553, 558 (4th Cir. 2005) ("Ordinarily, the question of qualified immunity should be decided at the summary judgment stage.").

To resolve a qualified immunity defense, the court must (1) determine

---

[21] Plaintiff argues that the above test, which includes an objective and subjective component, does not apply following the Supreme Court's decision in *Kingsley v. Hendrickson*, 576 U.S. 389, 395 (2015) (holding that the Due Process Clause of the Fourteenth Amendment for excessive force is subject solely to an objective reasonableness test). However, as admitted by Plaintiff, the Fourth Circuit has not applied the *Kingsley* test to a pretrial detainee's medical indifference claim and has held that "regardless of *Kingsley*, qualified immunity turns on whether 'any reasonable official in the defendant's shoes would have understood that he was violating' that objective and subjective standard." *See Mays v. Sprinkle*, 992 F.3d 295, 301–02 (4th

33

whether the facts alleged, taken in the light most favorable to the plaintiff, show that the defendants' conduct violated a constitutional right, and (2) determine whether the right was clearly established at the time of the alleged misconduct. *Pearson v. Callahan*, 555 U.S. 223, 232 (2009). Courts may address the two prongs of the qualified immunity analysis in whichever order is appropriate in light of the circumstances of the particular case at hand. *Id.*

Plaintiff asserts a claim under 42 U.S.C. § 1983 against Hassan "for violating Beland's Fourteenth Amendment rights by being deliberately indifferent to her serious medical needs during his 9:00 p.m. to 11:00 p.m. shift as the infirmary custody officer on August 18, 2017." [*See* ECF No. 47 at 13]. Plaintiff further argues that she "has established for purposes of summary judgment Beland was in an emergency life-threatening medical situation when Deputy Hassan saw her sitting on the toilet next to the red emergency button she had pushed, pointing towards her bloody vomit on the floor at 10:18 p.m. on August 18, 2017." *Id.* at 18. As the basis for Hassan's liability, Plaintiff focuses on the delay that occurred between Hassan witnessing Beland's vomit after she pressed the red button and Hassan reporting Beland's condition to Nurse Jordan.

On the night in question, the record shows Beland had an objectively-

---

Cir. 2021) (citations omitted)).

serious medical condition. However, Plaintiff has not shown that Hassan was deliberately indifferent to that condition. Hassan testified that he conducted rounds every 15 minutes, and that he reported Plaintiff's condition to Jordan after he finished the round he had begun. Although the record indicates Rutledge did not go to Beland until 10:51 p.m., there is no indication that Hassan was responsible for this delay, and, instead, Hassan testified Rutledge was delayed because she was attending to other patients. There is also no indication Hassan had any awareness or any reason to be aware that his response was inadequate or that, for example, Beland was in crisis, such as choking to death. Nor is there any indication that the content of his report to Jordan was inadequate, or that he had further, or any, responsibility in providing medical care to Beland in the time that elapsed between Hassan's report to Jordan and Rutledge going to Beland.[22] Instead, the record indicates he informed Jordan at some point less than fifteen minutes after asking Beland if she had thrown up, and her responding in the affirmative, that Beland had "[m]oved to the toilet and pushed red call button" and "had thrown up reddish brown liquid." [ECF No. 41-29].

---

[22] Plaintiff argues that Hassan walking by Beland's door again, after he reported her condition to Jordan, without looking in, constitutes deliberate indifference. [*See* ECF No. 47 at 19–20]. However, as stated, evidence submitted by Plaintiff does not record what occurred prior to 10:51 p.m., including that Hassan allegedly walked by Beland's door. [*See* ECF No. 42-34].

The instant situation is unlike cases cited by Plaintiff where courts found sufficient evidence of deliberate indifference, particularly in that, unlike the cases cited by Plaintiff, Beland was already in the care of medical personnel. *See Iko v. Shreve*, 535 F.3d 225, 242 (4th Cir. 2008) (on summary judgment, holding officers deliberately indifferent where the inmate collapsed under circumstances that made clear his need for medical attention and rejecting officers' argument "that they believed they could delegate Iko's medical care to the nurse" where no medical care was provided); *Sams v. Armor Corr. Health Servs., Inc.*, C/A No. 3:19-639, 2020 WL 5835310, at *6–7, 29 (E.D. Va. Sept. 30, 2020) (holding sufficiently alleged that officers were deliberately indifferent when the prisoner was "showing outward signs of serious medical distress" and the officers failed to provide access to medical care throughout the night); *Coats v. Pope*, C/A No. 1:17-02930-TLW, 2019 WL 5586871, at *6 (D.S.C. Oct. 30, 2019) (denying summary judgment based on the evidence that "approximately forty-three minutes transpired between the time Cowan began exhibiting serious medical issues (vomiting, delirium, inability to walk or talk, and seizures) and the time GCDC Officers activated EMS").

The instant case also is unlike those where "a factfinder may conclude that the official's response to a perceived risk was so patently inadequate as to justify an inference that the official actually recognized that his response

36

to the risk was inappropriate under the circumstances." *Parrish ex rel Lee v. Cleveland*, 372 F.3d 294, 303 (4th Cir. 2004). Nor has Plaintiff put forth any evidence that the minutes delay caused by Hassan finishing his rounds "exacerbated the injury or unnecessarily prolonged an inmate's pain." *Formica v. Aylor*, 739 F. App'x 745, 755 (4th Cir. 2018) (citations omitted); *see also Estelle*, 429 U.S. at 104–05 (holding that deliberate indifference may be demonstrated by "intentionally denying or delaying access to medical care"). Based on Hassan's testimony that Rutledge was unable to respond to Beland because she was busy with other patients, there is no indication that had Hassan informed Jordan minutes sooner as to Beland's condition, Rutledge would have seen Beland sooner.

Having found no constitutional violation, the undersigned finds Hassan is entitled to qualified immunity and recommends the district judge grant CCSO Defendants' motion as to Plaintiff's claim against Hassan for deliberate indifference to her serious medical needs.

c.    State Law Claims Grounded in Negligence

Plaintiff argues that "Count II (survival) and III (wrongful death) of the Second Amended Complaint assert a claim against the Charleston County Sheriff's Office under the South Carolina Tort Claims Act for the gross negligence of Deputy Hassan that proximately caused the death of Ms. Beland." [ECF No. 47 at 23]. As stated, Plaintiff's state-law claims against

Hassan and the CCSO are brought pursuant to the South Carolina Tort Claims Act, S.C. Code Ann. § 15-78-70 *et seq.* ("SCTCA").

The SCTCA is "the exclusive remedy for any tort committed by an employee of a governmental entity" acting within the scope of his employment. S.C. Code Ann. § 15-78-70(a). "The State, an agency, a political subdivision, and a governmental entity are liable for their torts in the same manner and to the same extent as a private individual under like circumstances, subject to the limitations upon liability and damages, and exemptions from liability and damages, contained" within the SCTCA. S.C. Code Ann. § 15-78-40. Claims brought pursuant to the SCTCA against an employee acting within the scope of his official duties must be brought against the agency or political subdivision for which the employee was acting at the time. *See* S.C. Code Ann. § 15-78-70(c).

As relevant here, the SCTCA additionally provides a "governmental entity is not liable for the loss resulting from" "responsibility or duty including but not limited to supervision, protection, control, confinement, or custody of any student, patient, prisoner, inmate, or client of any governmental entity, except when the responsibility or duty is exercised in a grossly negligent manner." S.C. Code Ann. § 15-78-60(25). "Gross negligence is the intentional conscious failure to do something which it is incumbent upon one to do or the doing of a thing intentionally that one ought not to do."

*Etheredge v. Richland Sch. Dist. One*, 534 S.E.2d 275, 277 (S.C. 2000) (citation omitted). It is the failure to exercise even "slight care." *Id.*; *see also Hollins v. Richland Cty. Sch. Dist. One*, 427 S.E.2d 654, 656 (S.C. 1993) (defining gross negligence as "the absence of care that is necessary under the circumstances") (citations and emphasis omitted)).

Here, for many of the same reasons articulated above regarding Plaintiff's claim for deliberate indifference against Hassan, Plaintiff has failed to submit evidence that Hassan failed to exercise even slight care where the record shows that he reported Plaintiff's condition to Jordan after he finished his round. The court rejects Plaintiff's argument that Hassan testified "it was incumbent upon him to make sure Beland got medical care when he found her distress" [ECF No. 47 at 23], where, in fact, Hassan testified one of his responsibilities was to "make sure if anyone needed any help, I notified the nurses," a responsibility he fulfilled. [ECF No. 47-32 at 9:22–10:3]. Plaintiff seeks to hold Hassan accountable for his lack of urgency, but has failed to offer sufficient evidence that Hassan was intentionally conscious that he failed to do something it was incumbent for him to do, that he failed to exercise the slightest care, or that he failed to provide care necessary under the circumstances.

The undersigned therefore recommends the district judge grant CCSO's motion for summary judgment as to Plaintiff's state-law claims against

Hassan and the CCSO.[23]

       3.     CCOH's Motion for Summary Judgment

       a.     Deliberate Indifference to a Serious Medical Need

Plaintiff additionally brings a claim for deliberate indifference to Beland's serious medical need, in violation of her Fourteenth Amendment rights, against the 18 individually-named CCOH Defendants.

As conceded by CCOH Defendants, "it is quite clear that the CCOH Defendants were on notice that Beland may experience some degree of withdrawal from heroin, as she reported a two-bag-a-day usage on her intake medical screen." [ECF No. 42-1 at 20]. Although CCOH Defendants fall short of conceding Beland had a serious medical need, *see id.*, the record and applicable law are sufficient to conclude that, in this case, Beland's withdrawal qualifies as a serious medical need. *See, e.g., Est. of Dellinger by & through Dellinger v. Bryant*, C/A No. 1:19-44-BHH-SVH, 2020 WL 6292550, at *4 (D.S.C. Feb. 5, 2020) ("Several courts have found that symptoms of alcohol and drug withdrawal qualify as a serious medical need.") (collecting cases)), report and recommendation adopted in part, overruled in part, C/A No. 1:19-44-BHH, 2020 WL 5249196 (D.S.C. Sept. 3, 2020).

As stated by Keller, "Severe Opioid Withdrawal can lead to severe

---

[23] Given the recommendation above, it is unnecessary to address the parties' arguments as to whether immunity pursuant to either S.C. Code Ann. § 15-

dehydration and death, as in this case." [ECF No. 51-12 at 2]. Plaintiff argues that Beland had a "serious and, indeed, emergency medical condition at 7:45 p.m. on August 18, 2017, when she began a gastrointestinal bleed in her stomach." [*See* ECF No. 51 at 27, 30]. In support, Plaintiff offers the following from Galan as found in her original report:

> In addition to the above, when Ms. Beland was found on August 18 at 7:45 pm with an elevated pulse (113) and emesis testing positive for blood, she should have been transported to an emergency room immediately. At this point, she was having a GI bleed, which should have been detected. If detected and treatment started, more likely than not, she would have survived. The above noted breaches in the standard of care directly and proximately resulted in the severe dehydration and death of Brianna Beland.

[ECF No. 47-28 at 4].

The record indicates that when Simmons called the second Code 37E Medical Emergency for Beland, multiple nurses responded. However, it was Jordan who included the entry in Beland's medical record that there was a "small amount of brownish emesis on towel hemoccult+" [ECF No. 42-3 at 39], and Jordan who informed Williams by phone as to Beland's condition. Although Rutledge testified that when a person is spitting up blood, she should "inform the provider, get orders, and try and rehydrate and possible send them out [to a hospital] if needed" [ECF No. 51-29 at 10:18–11:1], there is no indication in the record that Rutledge or Jordan ever informed Williams

---

78-60(5) or S.C. Code Ann. § 15-78-60(20) is applicable to present case.

1:20-cv-03006-SAL-SVH     Date Filed 10/12/21     Entry Number 65     Page 42 of 55

that Beland was spitting up blood, and, instead, it appears that Williams was informed that Beland was able to walk without assistance even though she was moved via wheelchair into and around medical. After arriving at medical, evidence indicates that Beland continued to spit up blood, that Rutledge interacted with Beland at this time, and that the decision was made to move Beland to another room. Finally, there was a delay between when Hassan informed Jordan that Beland had thrown up additional reddish brown liquid until 10:51 p.m. when Rutledge went to check on Beland and found her unresponsive. Again, at no point was Williams updated concerning Beland's condition or her continuing to spit up or throw up blood.

Given Plaintiff's expert testimony and taking these facts in light most favorable to Plaintiff, a jury could conclude that Jordan and Rutledge, particularly based on their training, subjectively knew and disregarded an excessive risk to Beland's health and delayed in providing appropriate treatment. *See Formica*, 739 Fed. App'x at 755 ("[a] delay in treatment may constitute deliberate indifference if the delay exacerbated the injury or unnecessarily prolonged an inmate's pain"); *Estelle*, 429 U.S. at 105 (holding that deliberate indifference may be demonstrated by "intentionally denying or delaying access to medical care"); *Parrish*, 372 F.3d at 303 ("a factfinder may conclude that the official's response to a perceived risk was so patently inadequate as to justify an inference that the official actually recognized that

his response to the risk was inappropriate under the circumstances"); *see also, e.g., Quintana v. Santa Fe Cty. Bd. of Commissioners*, 973 F.3d 1022, 1030, 1033 (10th Cir. 2020) ("The presence of blood in vomit makes the presence of a serious medical need more plausible and more obvious. In our view, taking the allegations as true, a jury could conclude the seriousness of the medical risks associated with vomiting blood would be obvious to any reasonable observer . . . . Officer Chavez's inaction in the face of Ortiz's bloody vomiting therefore violated clearly established law.").

Plaintiff argues that in addition to Jordan and Rutledge, other "Defendants who were monitoring [Beland's] treatment" were deliberately indifferent, who made no "effort to transfer her to the emergency room" and instead "adopted a 'wait and see' attitude," further arguing a jury could find this response "objectively unreasonable" and that "material questions of fact exist as to whether the circumstantial evidence is sufficient for the jury to find that the individual Defendants actually recognized that Ms. Beland needed emergency medical treatment." [ECF No. 51 at 27, 32].[24] Plaintiff specifically identifies Williams. However, as stated, the record indicates Williams was not accurately or completely informed as to Beland's condition, and Plaintiff has failed to put forth any other evidence indicating Williams

---

[24] Plaintiff again argues in part that the "objectively unreasonable" test, not formally adopted by the Fourth Circuit, as found in *Kingsley*, should apply.

was deliberately indifferent to Beland's serious medical condition.

Plaintiff additionally argues generally that "Jacobs formally diagnosed Ms. Beland with 'opiate/benzo withdrawal' on August 17, 2017," and, therefore, "at least from this time forward, Ms. Beland faced a serious medical condition known to all Defendants." [ECF No. 51 at 30]. As stated by Plaintiff, "Beland pleaded for medical care eight times before her death. Her deteriorating physical condition was so obvious that twice fellow inmates alerted the guards that she needed medical help. Ms. Beland's vomiting and cramping were visible to the naked eye." *Id.* at 32 (emphasis removed). However, Plaintiff has failed to specifically identify additional CCOH Defendants who knew of and disregarded an excessive risk to Beland, as opposed to additional CCOH Defendants who were negligent or could be subject to a medical malpractice claim, as discussed more below. *See Grayson v. Peed*, 195 F.3d 692, 695 (4th Cir. 1999) ("Deliberate indifference is a very high standard—a showing of mere negligence will not meet it.").[25]

---

[*See* ECF No. 51 at 24–29].

[25] Plaintiff argues that "[p]erhaps the most revealing evidence of deliberate indifference occurred when, during transport to medical following the second Code 37E Medical Emergency, Nurse Flynn mocked Beland's cramped hands in the elevator." [ECF No. 51 at 8]. To the extent Flynn mocked Beland, such actions, although unprofessional and unwarranted, do not rise to the level of a constitutional violation. *See, e.g., Kirkland v. Kershaw Corr. Inst.*, C/A No. 0:08-80-HMHB, 2008 WL 784226, at *2 (D.S.C. Mar. 20, 2008) ("As for his complaint that prison officials have spoken to him in a disrespectful manner, verbal harassment is not in and of itself a constitutional violation.").

The parties disagree as to whether Jordan and Rutledge are entitled to assert the defense of qualified immunity. [*See, e.g.*, ECF No. 58 at 7–9]. The court need not resolve this issue at this time. Assuming, without deciding, that Jordan and Rutledge are entitled to assert this defense, grant of qualified immunity at this time would be inappropriate. Taking the facts in light most favorable to Plaintiff, Jordan and Rutledge violated Beland's clearly-established rights by failing to provide and/or delaying appropriate treatment for not only her withdrawal, but also evidence of having a gastrointestinal bleed. *See Scinto v. Stansberry*, 841 F.3d 219, 236 (4th Cir. 2016) (holding that "[t]here is no requirement that the very action in question must have previously been held unlawful for a reasonable official to have notice that his conduct violated that right"; rather, "we define the right in question as the right of prisoners to receive adequate medical care and to be free from officials' deliberate indifference to their known medical needs") (citations omitted)).

Accordingly, the undersigned recommends the district judge grant in part and deny in part CCOH Defendants' motion for summary judgment as to Plaintiff's claim for deliberate indifference, allowing this claim to proceed against Jordan and Rutledge.

b.    State Law Claims Grounded in Negligence

Under South Carolina law, "[t]o establish a cause of action for medical

malpractice, the plaintiff must prove the following facts by a preponderance of the evidence:

> (1) The presence of a doctor-patient relationship between the parties;
>
> (2) Recognized and generally accepted standards, practices, and procedures which are exercised by competent physicians in the same branch of medicine under similar circumstances;
>
> (3) The medical or health professional's negligence, deviating from generally accepted standards, practices, and procedures;
>
> (4) Such negligence being a proximate cause of the plaintiff's injury; and
>
> (5) An injury to the plaintiff.

B*rouwer v. Sisters of Charity Providence Hosps.*, 763 S.E.2d 200, 203 (S.C. 2014) (citations omitted)). CCOH Defendants do not dispute the existence of a doctor-patient relationship between them and Beland, nor injury as to Beland. Therefore, the court focuses on the elements of the breach of the standard of care and proximate cause.[26] Turning to Plaintiff's four experts, each has identified the relevant standard of care and breach of that care by

---

[26] Both parties group Plaintiff's two negligence-based causes of action into a general claim of medical malpractice. [*See, e.g.*, ECF No. 42-1 at 27 ("Specifically, Plaintiff brings survival and wrongful death claims against these Defendants. These are both State law claims brought pursuant to statutes regarding claims most commonly referred to as 'medical malpractice.'") (citations omitted))]. In keeping with the parties' practice, the undersigned declines in the first instance to determine whether or to what extent each claim applies to which CCOH Defendants, and addresses Plaintiff's causes of action as a general claim for medical malpractice.

certain CCOH Defendants, leading to Beland's suffering and eventual death.

More specifically, as to Nurse Newman, who performed the medical screening of Beland when she was first transferred to the detention center, Linda Bernard ("Bernard"), RN, opined as follows:

> Per policy, contract and NCCHC essential Standard J-Er02 Receiving Screening, the receiving screening must include the last time a legal or illegal drug was used. This information was not included on the form, nor was it asked of Brianna Beland during intake. Prescribed medications should be continued. Nurse Newman was aware that Ms. Beland had prescriptions for medications, but took no action to verify those medications, or notify a provider for orders. Nationally accepted standards including NCCHC Standard Patients with Alcohol and Other Drug Problems, require inmate with drug problems to be assessed and properly managed by a physician. During the intake screening no referral was made for drug abuse, prescription medications or Mental Health. This is not what a prudent nurse would do in a similar situation, and the Standard of Care is not met.

[ECF No. 51-40 at 3–4]. As to all CCOH Defendants, except for Jacobs, Bernard provided the following:

> COWS (Clinical Opiate Withdrawal Scale) Evaluations were ordered every 8 (eight) hours and were completed twice on Aug 15, once on August 16, twice on Aug 17, and once on Aug 18. There are many discrepancies, and incorrect scoring. On Aug 15 & 16 the pulse should be scored as 1 point, and it is not. On Aug 17 GI upset is scored as a 1, and the total score is a 0. There are several reports of Ms. Beland's hands being painful and cramping on August 17, but there is only one indication, on Aug 18, that she has bone or joint aches. There are refusals for COWS on Aug 15 at 7:55 pm, and Aug 17 at 8 pm, Ms. Beland did not sign either refusal. According to nationally accepted standards of care, including NCCHC standard J-I-05 Informed Consent and Right to Refuse, a patient must be given a description of the service

being refused, and informed of any adverse consequences to health that may occur as a result of the refusal. Ms. Beland was exhibiting increased signs and symptoms of withdrawal, was reportedly refusing evaluation for such, but no referral was made to a provider. This is not what a prudent nurse in a similar situation would do. The standard is not met.

Ms. Beland appeared to be withdrawing as early as August 16, when she was vomiting. Her symptoms progressed to more systemic symptoms when she was having muscle pain and spasms and had a disheveled appearance with sunken cheeks. The autopsy showed acute kidney injury with dehydration. Erratic vital signs can also be an indication of dehydration. During Ms. Beland's three-day incarceration her systolic blood pressure varied from 100 (on Aug 18) to 122 (on Aug 17), diastolic blood pressure 66–80 (both on Aug 18), and pulse ranged from 54 (Aug 17) to 113 (Aug 18). The Charleston County Detention Center operates an infirmary. According to infirmary Policy, IV therapy is provided. No life sustaining lV fluids were ordered or provided to Brianna Beland despite obvious dehydration signs and symptoms . . . .

When Ms. Beland was found on August 18 at 7:45 pm with an elevated pulse (113), and emesis testing positive for blood, she should have been transported to an emergency room immediately. This delay in care resulted in additional blood loss and contributed to her death.

The nursing staff working during the time period in question, and who saw Ms. Beland, had a duty to properly assess, monitor, and provide medical treatment.

*Id.* at 3–4.

Plaintiff has additionally offered the following expert opinion from

Galan concerning CCOH Defendants in general:

In my professional opinion, the Defendants in this case deviated from the standard of care and skill generally exercised by medical/correctional staff under similar conditions. In my

48

opinion, the Defendants deviated from the standard of care in the following particulars:

- Failing to properly assess Ms. Beland;
- Failing to order and obtain the proper lab testing;
- Failing to properly monitor Ms. Beland;
- Failing to properly evaluate Ms. Beland's condition after she passed out in the recreation yard on August 17.
- Failing to properly evaluate Brianna's worsening condition after significant hand/foot pain, cramp/spasms were reported.
- Failing to obtain orthostatic blood pressure, pulse, check electrolytes (magnesium and potassium), EKG, hemoglobin, BUN, creatinine, especially after vomiting repeatedly and obvious decline in condition.
- Prescribing medications, such as Phenergan and Zofran, that can affect QT interval, promoting arrhythmia.
- Failing to order or provide life sustaining IV fluids despite obvious dehydration signs and symptoms; and
- Failing to provide the proper care for Ms. Beland . . . .

In addition to the above, when Ms. Beland was found on August 18 at 7:45 pm with an elevated pulse (113) and emesis testing positive for blood, she should have been transported to an emergency room immediately. At this point, she was having a GI bleed, which should have been detected. If detected and treatment started, more likely than not, she would have survived. The above noted breaches in the standard of care directly and proximately resulted in the severe dehydration and death of Brianna Beland.

[ECF No. 51-28 at 4].

Plaintiff has additionally offered the following expert opinion from

Keller concerning all CCOH Defendants:

1.  Ms. Beland showed classic symptoms of opioid (and possibly polysubstance) withdrawal beginning on 8/16/2017, most significantly persistent vomiting and later muscle spasms. The clinical practitioners NP Williams and Dr. Jacobs both appropriately recognized that Ms. Beland was suffering from

opioid withdrawal as reflected in their Patient Visit Reports.

2.    However, despite knowing that Ms. Beland was suffering from a serious condition that is easily treatable, neither NP Williams or Dr. Jacobs chose to treat Ms. Beland with any of the medications effective for this condition, namely clonidine, lofexidine, buprenorphine or methadone. She was given Phenergan but this was predictably ineffective in improving her condition. Phenergan is not an appropriate or effective single agent for the treatment of opioid withdrawal. It simply does not work. Brianna Beland was basically allowed to go through the painful process of withdrawal "cold turkey," which eventually caused her death. Had Ms. Beland been treated with clonidine, lofexidine, buprenorphine or methadone, she more likely than not would not have deteriorated and would not have died. In my opinion, the failure to treat Brianna Beland with an appropriate medication for opioid withdrawal violated the standard of care for this condition.

3.    Despite clear evidence of a worsening clinical condition, no meaningful attempt was made to find out how sick Ms. Beland was. There is no record of a physical examination. No labs were drawn which could have shown severe dehydration, electrolyte abnormalities, and/or kidney and liver dysfunction. I am not sure if Ms. Beland ever saw a medical practitioner in person. If she did, no relevant history was obtained, no physical examination was performed and no meaningful treatment and monitoring plan was established. These lapses violated the standard of care.

4.    As Ms. Beland's condition deteriorated, including ongoing vomiting and then passing out in the recreation yard on August 17th, it was open [and] obvious even to a layperson that Ms. Beland had a serious medical condition and was in great distress.

5.    As Brianna Beland deteriorated further to the point of having multiple episodes of bloody vomitus, a syncopal episode and severe muscle contractions of her hands and legs, her worsening status clearly warranted transfer to a hospital by EMS, but this evidently was never considered.

6.    The medical staff working during the time period in

question, and who saw Ms. Beland during those days, had a duty to properly assess, monitor, and provide medical treatment. It should be emphasized here that monitoring alone was insufficient and this patient needed immediate medical treatment. This would include the following CCOH medical staff who were working at the detention center during the time period in question: Pepper Geiger, LPN; Glenda Williams, NP; Anntinette Ancrum, CMA; James Peirano, RN; Fatima Richardson/Fludd, LPN; Deborah Newman, RN; Angela Rutledge, RN; Richard Henry, RN; Tiffany Lattimore, LPN; Nurse E. Watson; Rosemary Jordan, RN; Lynette Morris, RN; Rachael Massullo, LPN; Megan Marsillo, LPN; Yolanda Kendrick, RN; Tara Steele, LPN; Wendy Austin, LPN; and Theodolph Jacobs, MD. It was especially important that with the information given the physician should have trigger more than just a monitoring for 4 hours in the medical unit. The standard of care required that the patient be seen and have a direct evaluation and examination by the responsible physician, or in lieu of that transfer to an outside facility.

[ECF No. 51-12 at 4–5].

CCOH Defendants' entire argument as to Plaintiff's medical malpractice claims is as follows:

Plaintiff has identified medical experts expected to testify on her behalf. [ECF No. 25]. Both the CCSO and CCOH Defendants have also identified experts expected to testify on their respective behalves. [ECF Nos. 29 and 30]. These Defendants contend that the Plaintiff's experts, in fact, support the above arguments with regard to Plaintiff's § 1983 deliberate indifference claim, insomuch as they detail generally the course of treatment and clinical decisions made by the CCOH Defendants. By that same token, however, Plaintiff's experts do not adequately support Plaintiff's Second and Third causes of action as they do not properly and completely connect the alleged standard of care deviations by the CCOH Defendants (either individually, or as a whole) as the proximate cause of Beland's death. Absent this crucial element of the malpractice claims, Plaintiff's State law claims must also fail and summary judgment is appropriate as a

matter of law.

[ECF No. 42-1 at 29, *see also generally* ECF No. 58].

Although CCOH Defendants briefly argue that Plaintiff has failed to carry her burden as to causation, they do not specifically address the causation claims made by Plaintiff's experts. For example, Bernard, Galan, and Keller all offered that Beland more likely than not would have survived had she been transported to the emergency room at 7:45 p.m. on August 18, 2017, as the standard of care required. CCOH Defendants also do not address Plaintiff's argument that CCOH Defendants' causation argument is irrelevant as to Plaintiff's second cause of action, the survival claim. [*See* ECF No. 51 at 22]. As stated by the South Carolina Court of Appeals, "[t]he test of a survival action in South Carolina is whether the decedent suffered conscious pain and suffering." *Rutland v. S.C. Dep't of Transportation*, 700 S.E.2d 451, 454 (S.C. Ct. App. 2010) (citing *Camp v. Petroleum Carrier Corp.*, 28 S.E.2d 683, 685 (S.C. 1944)).

Considering evidence in light most favorable to Plaintiff, and in light of the expert testimony provided by Plaintiff as to each CCOH Defendant regarding her medical malpractice claims, as well as the extremely limited argument provided by CCOH Defendants in support of their motion and in response to Plaintiff, CCOH Defendants have failed to carry their burden to warrant dismissal of Plaintiff's medical malpractice claims at this time. The

undersigned recommends the district judge deny CCOH Defendants' motion for summary judgment as to Plaintiff's state-law claims based in negligence against CCOH Defendants, allowing these claims to proceed to trial.[27]

III.    Conclusion

For the foregoing reasons, the undersigned grants Defendants' motions to strike Galan's affidavit [ECF Nos. 48, 59], directs the clerk of court to strike the affidavits found at ECF Nos. 47-40 and 51-42, and denies Plaintiff's motion for extension of time [ECF No. 50]. The undersigned recommends the district judge grant CCSO Defendants' motion for summary judgment [ECF No. 41] and grant in part and deny in part CCOH Defendants' motion for summary judgment [ECF 42], allowing Plaintiff's first cause of action for deliberate indifference to proceed as to Jordan and Rutledge and allowing Plaintiff's second and third causes of action for state-law claims sounding in negligence to proceed against all CCOH Defendants.

IT IS SO ORDERED AND RECOMMENDED.

_Jima V. Hodges_

---

[27] In addition to the above, Plaintiff has argued "[t]here were additional deviations from the standard of care by Nurse Rutledge, Nurse Massullo, Nurse Jordan, Nurse Marsillo, and Nurse Newman" regarding the final moments of Beland's life. [*See* ECF No. 51 at 19–21]. However, Plaintiff has not submitted admissible expert testimony concerning this issue. *See, e.g., Brouwer*, 763 S.E.2d at 203 ("A plaintiff in a medical malpractice case must establish by expert testimony both the standard of care and the defendant's failure to conform to the required standard, unless the subject matter is of common knowledge or experience so that no special learning is needed to evaluate the defendant's conduct.") (citations omitted)).

October 12, 2021                          Shiva V. Hodges
Columbia, South Carolina                  United States Magistrate Judge

**The parties are directed to note the important information in the attached "Notice of Right to File Objections to Report and Recommendation."**

## Notice of Right to File Objections to Report and Recommendation

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge. Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections. "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'" *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see* Fed. R. Civ. P. 6(a), (d). Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
901 Richland Street
Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.** 28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).